## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL AUDUBON SOCIETY,
225 Varick Street
New York, NY 10014

*Plaintiff*,

*vs.*

DAVID BERNHARDT, in his official
capacity as Secretary of the Interior,
United States Department of the Interior,
1849 C Street, NW
Washington, DC 20240,

AURELIA SKIPWITH in her official
capacity as Director of the U.S. Fish and
Wildlife Service,
U.S. Fish and Wildlife Service,
1849 C Street, NW
Washington, DC 20240,

UNITED STATES DEPARTMENT OF
THE INTERIOR,
1849 C Street, NW
Washington, DC 20240,

and

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street, NW
Washington, DC 20240,

*Defendants*.

Case No. 20-cv-5065

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiff National Audubon Society ("Audubon") hereby challenges a new rule

(the "Excavation Rule" or "the Rule") promulgated by the Department of the Interior ("DOI" or

"the Department") that vastly expands potential sand mining projects in delicate coastal barriers

protected by the 1982 Coastal Barrier Resources Act ("CBRA" or "the Act"), Pub. L. No. 97-348, 96 Stat. 1653 (1982) (codified as amended at 16 U.S.C. § 3501 *et seq.*).

2.     Coastal barriers are undeveloped sandy landforms near the coast, such as barrier islands, sand bars, sand dunes, and coastal aquatic habitats such as wetlands and estuarine waters. These areas serve as a crucial protective buffer for the mainland from severe coastal storms and erosion, while also providing irreplaceable habitats and spawning areas for aquatic creatures and migratory birds.

3.     In 1982, Congress concluded that federal policy had excessively subsidized development on coastal barriers, resulting in "the loss of barrier resources, threats to human life, health, and property, and the expenditure of millions of tax dollars each year." 16 U.S.C. § 3501(a)(4).

4.     To address those concerns, Congress passed the CBRA, which created a designated set of undeveloped coastal barriers, the Coastal Barrier Resources System ("the System"), and protected barriers within the System from wasteful federally-subsidized development.

5.     The CBRA initially designated 186 tracts ("System units") totaling 453,000 acres as part of the System, and shielded these areas from federally supported development efforts. Congress has subsequently expanded the System twice, in the 1990 Coastal Barrier Improvement Act and the Strengthening Coastal Communities Act of 2018. The System now includes approximately 1.3 million acres of land across 585 System units, as well as an additional 2.1 million acres of "otherwise protected areas" ("OPAs") held for conservation.[1]

---

[1] *See* U.S. Gov't Accountability Off., GAO-07-356, *Coastal Barrier Resources System: Status of Development That Has Occurred and Financial Assistance Provided by Federal Agencies* 1–2

6.      The CBRA protects the lands within the System "by restricting future Federal expenditures and financial assistance which have the effect of encouraging development of coastal barriers." 16 U.S.C. § 3501(b). To that end, Congress prescribed that "no new expenditures or new financial assistance may be made available under authority of any Federal law for any purpose within the [Coastal Barrier Resources] System," *id.* § 3504 (a), including, specifically, any projects undertaken to "stabilize[] any inlet, shoreline, or inshore area." *Id.* § 3504(a)(3).

7.      Congress included limited exceptions to the CBRA's prohibition on federal expenditures "within" the System for certain projects that would serve the goals of the CBRA and the System itself, such as those seeking to study and protect wildlife resources and habitats, erect navigation aids, or stabilize the shoreline by "mimic[king], enhanc[ing], or restor[ing] a natural stabilization system." *Id.* § 3505 (a)(6)(G).

8.      Consistent with Congress's requirements, for over 25 years DOI rejected efforts by federal agencies to dredge and remove scarce System resources to stabilize or renourish developed beaches outside the System.

9.      This prohibition has frustrated some developed beachfront communities, which have long coveted the sand from nearby System units to replenish their beaches, because transporting sand from nearby System units is cheaper than transporting sand from less ecologically sensitive (but more distant) areas.

10.      In October, under pressure from Members of Congress representing some coastal communities, the Department of the Interior unlawfully eviscerated Congress's protections

----

(March 2007),  https://www.gao.gov/assets/260/257815.pdf; U.S. Fish and Wildlife Serv., *Coastal Barrier Resources System: Coastal Barrier Resources Act* (last updated Jan. 2020), https://www.fws.gov/cbra/Act.html.

without notice or justification. The Secretary of the Interior declared in a letter to three Members of Congress that the agency would begin allowing federal funding of projects that dredge sand from coastal barriers within the System to be transported to developed beaches outside the System.

11.     The Fish and Wildlife Service ("FWS"), an agency within DOI, has since begun implementation of this new rule, informing the public that FWS "will advise federal agencies that [the CBRA] allows for sand removal from [System units] to be used to replenish beaches located . . . outside" the System.[2]

12.     The Excavation Rule is not only shortsighted and environmentally destructive, but also contrary to the letter and the spirit of the CBRA, which prohibits the actions endorsed by the Excavation Rule.

13.     Contrary to the plain language of the CBRA—which prohibits federally-financed projects in the System to "stabilize[] any inlet, shoreline, or inshore area," with a limited exception only for projects "within" the System—DOI's new Excavation Rule permits federally-financed projects to remove sand from protected areas and transport it to developed beaches *outside* the System of protected areas for shoreline stabilization projects.  The Excavation Rule is also antithetical to the purpose and structure of the CBRA, which seeks to preserve the protected barriers in service to federal taxpayers, wildlife, and coastal communities threatened by storms and sea level rise. Moreover, DOI promulgated the new rule—which abruptly departed from over a quarter century of precedent—without providing the public notice or opportunity to comment as required by the Administrative Procedure Act.

---

[2] FWS, *Coastal Barrier Resources System: Hot Topics* (last updated Nov. 14, 2019), https://www.fws.gov/cbra/.

14.     Plaintiff is a non-profit membership organization that seeks to ensure the long-term preservation of bird populations that rely on the protections of the CBRA to safeguard crucial habitats. The Excavation Rule threatens the integrity of those habitats by opening them to destructive sand mining projects, which has significant implications for Audubon's mission and its members.

15.     Plaintiff brings this action, on behalf of itself and its members, for declaratory and injunctive relief, seeking a declaration that the Excavation Rule is unlawful and an order setting aside the Rule.

## PARTIES

16.     Defendant DAVID BERNHARDT is the United States Secretary of the Interior, and signed the Excavation Rule. Secretary Bernhardt is the official tasked in the CBRA with maintaining maps of the System, adding land to the System, and consulting with other Federal officers concerning the scope the CBRA's restrictions and exceptions. *See* 16 U.S.C. §§ 3503, 3505(a). Secretary Bernhardt signed the letter announcing the Excavation Rule and directed the U.S. Fish and Wildlife Service's compliance with the Rule. He has ultimate authority over the Department of the Interior's implementation of the CBRA and is sued in his official capacity.

17.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an agency within the executive branch of the federal government ultimately responsible for implementing the CBRA's protections.

18.     Defendant AURELIA SKIPWITH is the Director of the U.S. Fish and Wildlife Service, the agency within DOI with delegated responsibilities for implementing and enforcing the CBRA. She is sued in her official capacity.

19.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the executive branch of the federal government responsible for implementing the CBRA's protections by consulting with federal agencies about projects that could affect the System.

20.     Plaintiff NATIONAL AUDUBON SOCIETY is a national non-profit conservation organization incorporated in New York, NY and exempt from tax under Section 501(c)(3) of the Internal Revenue Code.

21.     Audubon, founded in 1905, is dedicated to protecting birds and the places they need, today and tomorrow, throughout the Americas using science, advocacy, education, and on-the-ground conservation. Audubon has over 1.7 million members, operates 34 nature centers, has 18 state and regional offices, and has over 450 local chapters throughout the country.

22.     One of Audubon's core efforts is its coastal program, which seeks to reverse steep ongoing declines in marine and coastal bird populations due to climate change, development, overfishing, and pollution. This program is critical to address the loss of North American shorebird populations; indeed, North American migratory shorebird populations have declined by almost 70 percent since 1973.[3]

23.     Audubon's coastal program promotes policies and projects that create undisturbed coastal habitats for birds and other wildlife, save taxpayer dollars, and safeguard coastal communities from storms. It also seeks to defend and support policies that protect the aquatic wildlife that serves as prey for predatory coastal and marine birds, and to restore, protect, and create new shorebird and seabird sanctuaries and marine protected areas.

---

[3] North American Bird Conservation Initiative, *The State of North America's Birds 2016*, https://www.stateofthebirds.org/2016/wp-content/uploads/2016/05/SoNAB-ENGLISH-web.pdf.

24.     As described in more detail below, the coastal barrier areas protected by the CBRA are of particular importance to American bird populations (and Audubon's coastal program), and those populations will face severe challenges if the integrity of the System is compromised.

25.     Due to the crucial ecological importance of protected coastal barriers to bird populations, Audubon's coastal program engages in extensive research, advocacy, and member education efforts related to the CBRA. Audubon actively supported the legislation that established the System in 1982 and that expanded it further in 1990 and 2018, and is today the national leader in efforts to protect and expand the System.

26.     The CBRA has provided one of the most effective tools for ensuring coastal resiliency and the safety of continued habitats for birds, fish, and other wildlife.

27.     Audubon's recent work related to the System includes a variety of efforts to educate its members, the public, and elected representatives, and ensure that the System is protected from destructive development for the foreseeable future.

28.     Audubon ran a successful national campaign, culminating in December 2018, to pass legislation expanding the System by over 18,000 acres, involving extensive work by Audubon staff and leadership to educate elected officials about the benefits of the CBRA and the need to expand the System in five focal states (Delaware, North Carolina, South Carolina, Florida, and Louisiana). In support of this effort, Audubon produced a variety of educational and advocacy materials, submitted public comments on proposed maps to expand the System, and worked to build an allied coalition of other conservation, taxpayer advocacy, and fiscally conservative groups.

29.     In the wake of 2012's Hurricane Sandy, Audubon built and led a national coalition that is working to expand the System by 277,000 acres in states affected by that hurricane, which included retention of a consultant to assist Audubon staff and leadership in the initiative, extensive work by Audubon staff and leadership in reviewing and commenting on draft maps of proposed System expansions in hurricane-affected states (Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island and Virginia), educating and coordinating a broad set of interest groups (including taxpayer advocates, market-oriented think tanks, insurance industry representatives, state officials, sportsmen organizations, and national, regional, state and local conservation groups) to support System expansion, and producing educational and advocacy materials to support the effort.

30.     Last year, Audubon produced a video on coastal resiliency, with a major focus on the CBRA, in conjunction with the Cornell Lab on Ornithology, and hosted a panel discussion and video viewing on Capitol Hill in September 2019.

31.     Audubon also supported the development and publication of a March 2019 economic analysis of the cost-savings from the CBRA, the first economic analysis of the CBRA's benefits since the 1980s, by working with researchers to provide background materials, consult on the development of the analysis, and review report drafts. Audubon used this study to generate support for the next phase of expansion of the System in areas affected by Hurricane Sandy.

32.     In recent years, Audubon has monitored growing pressure from some elected officials and coastal communities to weaken the CBRA and allow sand mining in System units for the benefit of developed beaches outside the System. This pressure culminated in the

Excavation Rule at issue in this case, which impedes Audubon's work to protect coastal resources going forward.

33.     The Excavation Rule has potentially subjected vast swaths of previously protected coastal areas to federally-financed sand mining and dredging. Indeed, a database maintained at Western Carolina University has identified over 1,770 instances of beach renourishment in states along the Atlantic and Gulf coasts—the precise type of project that may now be federally funded under the Excavation Rule even when sourcing sand from System units.[4]

34.     Beach renourishment projects that remove sand from System units will negatively impact birds and their habitats, forcing Audubon to expend resources to ensure conservation of System habitats and threatening the ability of its members to engage in recreational birding activities in CBRA-protected areas.

35.     After the Department's announcement of the Excavation Rule, and in the absence of the Department opening a defined and publicized period for public comment on the rule, Audubon drafted, edited, finalized, and submitted detailed comments on the Rule on behalf of itself and key partner organizations in December 2019.

36.     In response to the Excavation Rule, Audubon has been forced to retain a consultant to help monitor, research, and comment on coastal development projects that previously would have been ineligible for federal funding under the CBRA, with an initial focus on proposed and potential projects in North Carolina, South Carolina, New Jersey, and Florida. Audubon's consultant has spent time obtaining information about the potential application of the Excavation Rule to specific projects in the proposal stage of review.

---

[4] *Beach Nourishment Viewer*, Program for the Study of Developed Shorelines at Western Carolina University, http://beachnourishment.wcu.edu/.

37.     Audubon's national staff has also devoted additional time and resources to coordinating state-level responses to better monitor, research, and comment on projects that would have previously been ineligible for federal funding under the CBRA prior to the Excavation Rule.

38.     If the Excavation Rule continues to be operative, Audubon anticipates devoting staff and consultant time to monitor all federally-financed beach renourishment projects in order to ascertain whether those projects seek to (or are likely to seek to) mine sand from the System; prior to the Excavation Rule, Audubon understood System units to be shielded from such sand mining projects. These efforts will force Audubon to divert time and resources from other coastal program work.

39.     Indeed, since the announcement of the Excavation Rule, Audubon's coastal program consultant has already been forced to divert time away from existing work on coastal flood risks and their relationship to bird habitats, and other Audubon policy priorities, in order to obtain information about the Department's policy changes and monitor the permitting and environmental review of sand mining projects that would have been ineligible for CBRA funding prior to the Rule.

40.     Audubon estimates that the Excavation Rule has forced its national staff to devote nearly 100 hours to monitoring the effects of the Excavation Rule and coordinate efforts to defend coastal habitats from the Excavation Rule. Each of these hours came at the expense of other work national Audubon staff were previously undertaking related to coastal resilience and the protection of the Atlantic coast and Mississippi migratory flyways.

41.     Audubon also brings this action on behalf of its members.

42.     Audubon has over 1.7 million members nationwide, including over 750,000 members in states that will be affected by the Excavation Rule.

43.     Audubon's members rely on the preservation of areas protected by the CBRA to engage in recreational birdwatching. Indeed, based on data from the Cornell Lab of Ornithology, American birders have logged over 560,000 sightings of the Piping Plover, Red Knot, American Oystercatcher, and Least Tern (four of the Audubon coastal program's "flagship" species prioritized for protection efforts because their needs represent the needs of hundreds of other species) in states with areas protected by the CBRA.[5]

44.     The Excavation Rule threatens the integrity of delicate habitats currently protected under the CBRA, subjecting System units to federally-funded mining and dredging projects and rendering them less suitable (or entirely unusable) for the multiple species of birds that rely on CBRA-protected coastal barriers. That excavation, in turn, will affect the ability of Audubon's members to engage in birdwatching on System units, as well as threaten their ability to watch species who depend on coastal barriers and whose numbers will decline as their habitats are further disrupted.

45.     Given the System's importance to flagship and other species—and the sweep of Audubon's membership—it is certain that individual Audubon members will continue to frequent the System to view birds.

46.     An order from this Court setting aside, remanding, or enjoining the Excavation Rule would redress Audubon's organizational injuries by foreclosing any need to devote time and resources towards monitoring the Rule's implementation and coordinating national and state responses thereto.  It would accordingly leave Audubon free to pursue conservation projects and

---

[5] Data gathered from *eBird*, https://ebird.org/explore.

strategies as it had prior to the Rule, when its normal operations were not disrupted by a significant change to the Department's management of coastal barrier habitats.

47.     Such an order would likewise redress the injuries of Plaintiff's membership. Absent the Excavation Rule, sand within the System will stay within the System, staunching the loss of sensitive habitat—and the associated species—from which Audubon's members derive significant aesthetic and recreational benefits.

## JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the CBRA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

49.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff is headquartered in the district.

## LEGAL BACKGROUND

### I.     The CBRA

50.     While coastal areas are extremely attractive areas for residential and commercial development, Congress concluded in 1982 that careless and excessive development could threaten coastal barriers, nearby coastal communities, and the nation's wildlife. In the words of Senator John Chafee (author of the CBRA, and, as of 1999, the namesake of the John H. Chafee Coastal Barrier Resources System[6]), "[t]he plentiful fish and wildlife and stunning natural beauty of [coastal] barriers are truly national resources which should be conserved for the use and enjoyment of future generations."[7]

---

[6] Pub. L. No. 106-167, 113 Stat. 1803 (1999).
[7] 127 Cong. Rec. 7,571 (1981).

51.     In response to these concerns, Congress passed the Coastal Barrier Resources Act, stating that the purposes of the Act were to minimize "the loss of human life, wasteful expenditure of federal revenues, and the damage to fish, wildlife, and other natural resources associated with the coastal barriers." 16 U.S.C. § 3501(b). Because federal expenditures (such as development grants and subsidies, federal flood insurance, or coastal engineering projects) can play a major role in encouraging development, Congress intended the CBRA to take a "free-market approach to conservation" by removing federal incentives for harmful development.[8]

52.     The CBRA defines coastal barriers as "a depositional geologic feature (such as a bay barrier, tombolo, barrier spit, or barrier island) that is subject to wave, tidal, and wind energies, and protects landward aquatic habitats from direct wave attack," and includes in this definition "all associated aquatic habitats, including the adjacent wetlands, marshes, estuaries, inlets, and nearshore waters." 16 U.S.C. § 3502(1).

53.     The CBRA establishes the System, a set of "undeveloped coastal barriers and other areas located on the coasts of the United States that are identified and generally depicted on the maps on file with the Secretary entitled 'Coastal Barrier Resources System.'" *Id.* § 3503(a).

54.     The System is organized into individual tracts, or "System units," defined as "any undeveloped coastal barrier, or combination of closely-related undeveloped coastal barriers" included within the System. *Id.* § 3502(7).

55.     The CBRA's heart is the prohibition against federal expenditures in Section 5 of the Act.  In order to help ensure the long-term survival of the system of coastal barriers, the

---

[8] FWS, *Coastal Barrier Resources System: What are Coastal Barrier Landforms?* (last updated Apr. 16, 2018), https://www.fws.gov/CBRA/Coastal-Barriers.html.

CBRA provides that "no new expenditures or new financial assistance may be made available under authority of any Federal law for any purpose within the system." *Id.* § 3504(a).

56.     The CBRA lists examples of prohibited federal expenditures and financial assistance within the System, including "the carrying out of any project to prevent the erosion of, or to otherwise stabilize, any inlet, shoreline, or inshore area, except . . . in cases where an emergency threatens life, land, and property immediately adjacent to that unit." *Id.* § 3504(a)(3).

57.     As Senator Chafee explained when introducing the bill, this prohibition on shoreline stabilization expenditures in the CBRA was motivated by the belief that "[g]eologic processes are constantly eroding the physical composition of [coastal barriers], and man's efforts to stabilize" coastal barriers "are almost hopeless—and . . . very costly."[9]

58.     The CBRA contains some limited exceptions to its general prohibition, allowing that an "appropriate Federal officer, after consultation with the Secretary, may make Federal expenditures and may make financial assistance available *within the System* for" a list of exceptions that includes "Nonstructural projects for shoreline stabilization that are designed to mimic, enhance, or restore a natural stabilization system," so long as such projects are "consistent with the purposes" of the CBRA. 16 U.S.C. § 3505(a) (emphasis added). There is no such exception for projects outside the System.

---

[9] 127 Cong. Rec. 7,571, *supra* n.7. Indeed, confirming Senator Chafee's fears, a recent study of coastal development in Florida found that homes in coastal areas that required renourishment projects were "significantly larger and more numerous" than houses in zones that had not undertaken beach renourishment projects, suggesting a "positive feedback between nourishment and development that is compounding coastal risk in zones already characterized by high vulnerability." Scott B. Armstrong et al., *Indications of a positive feedback between coastal development and beach nourishment*, 4 Earth's Future 626 (Nov. 10, 2016), https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2016EF000425.

## II.     The Administrative Procedure Act

59.     The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

60.     With exceptions not relevant here, an agency seeking to promulgate a rule must publish a "[g]eneral notice of proposed rule making . . . in the Federal Register," providing, *inter alia*, "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3). The agency must also provide an opportunity for "interested persons . . . to participate in the rule making through submission of written data, views, or arguments" that the agency must consider prior to adopting a proposed rule. *Id.* § 553(c).

61.     The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. *Id* §§ 702–704.

62.     Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), that are "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C), or that are "without observance of procedure required by law." *Id.* § 706(2)(D).

## III.    The National Environmental Policy Act

63.     Congress enacted the National Environmental Policy Act ("NEPA")—the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a)—to ensure that federal agencies consider the environmental consequences of their actions. 42 U.S.C. § 4331(a)–(b). "The NEPA process is intended to help public officials make decisions that are based on [an]

understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

64.     The Council on Environmental Quality has promulgated regulations for implementing NEPA and that bind Defendants. *Id.* § 1500.3.

65.     NEPA requires that agencies prepare an Environmental Impact Statement ("EIS") for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe: (1) the "environmental impact of the proposed action"; (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) "alternatives to the proposed action"; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*

66.     Under NEPA, "federal actions" include "new or revised agency rules, regulations, plans, policies, or procedures." 40 C.F.R. § 1508.18(a).

67.     An agency may prepare an environmental assessment ("EA") to determine if its action will have "significant" impact and therefore requires an EIS. *Id.* § 1508.9(a)(1).  An environmental assessment must "provide sufficient evidence and analysis for determining whether to prepare an [EIS]" and discuss "the need for the proposal, [] alternatives . . . [, and] environmental impacts of the proposed action and alternatives[.]" *Id.* § 1508.9(a), (b).

68.     If a lawful environmental assessment reveals that the proposed action will not have a significant impact on the environment, the preparing agency need not prepare an EIS. *See id.* §§ 1501.4, 1508.13, 1508.9.

## FACTUAL BACKGROUND

### I.    America's coastal barriers

69.    Coastal barriers are long, narrow, low-lying landforms, such as barrier islands, bay barriers, wetlands, or sand dunes, that run parallel to coastlines and are surrounded by open water, wetlands, or other aquatic habitats separating the barrier from the mainland.[10]

70.    While only 6.5 to 13 percent of the planet's shorelines are protected by barrier islands,[11] the United States is fortunate to be home to "[o]ne of the longest and best defined chains of coastal barriers in the world," with over 2,700 miles of shorelines along the Atlantic Ocean and Gulf of Mexico shielded by barrier islands and other coastal barriers.[12]

71.    These barriers, when intact, safeguard the nation's geology, ecology, and economy.

72.    Coastal barriers protect communities along the Gulf of Mexico and the Atlantic seaboard in the United States from the impacts of coastal storms, like hurricanes and nor'easters. As FWS notes, in areas protected by coastal barriers, "[s]torm waves break on the barrier beach, leaving a diminished wave" to travel inland, where the wetland portions of coastal barriers "store[] storm flood waters, easing the flood pressure on the mainland."[13]

73.    Without the protection of coastal barriers, "damages from violent storms would be much greater." Indeed, one study of flood damage since the enactment of CBRA found that the

---

[10] FWS, *Final Report to Congress: John H. Chafee Coastal Barrier Resources System Digital Mapping Pilot Project* 1 (2016), https://www.fws.gov/ecological-services/habitat-conservation/cbra/maps/a/Chapter%201.pdf.
[11] Marius Ulm et al., *The Impact of a Barrier Island Loss on Extreme Events in the Tampa Bay*, 3 Frontiers in Marine Science 1 (Apr. 2016), https://www.frontiersin.org/articles/10.3389/fmars.2016.00056/full.
[12] FWS, *Coastal Barrier Resources System: What are Coastal Barrier Landforms?*
[13] *Id.*

law has likely saved the federal government nearly $10 billion from 1989 to 2013 in cleanup costs and disaster relief alone.[14]

74.      Climate change will make coastal barriers even more important. According to FWS, "Eastern coastal areas . . . and the Gulf Coast are especially vulnerable to sea level rise, and the mid-Atlantic coast has been identified as a 'hotspot' of accelerated sea level rise," with that region facing "increasing risks of flooding and related impacts due to projected increases in the co-occurrence of storm surges and rainfall."[15] Coastal barriers are expected to mitigate as much as $108 billion of these damages over the next 50 years.

75.      Coastal barriers are also home to extraordinarily vibrant and crucial ecosystems for a variety of wildlife. As FWS has noted, "[m]illions of fish, shellfish, birds, mammals, and other wildlife depend on barriers and their associated wetlands for vital feeding, spawning, nesting, nursery, and resting habitat."[16] The country's commercial fish and shellfish industries also rely on coastal barriers, which are critically important breeding and feeding grounds for countless valuable species.[17] And coastal barriers nurture downdrift marshes and beaches—themselves important habitats—by supplying those areas with loose sediment.[18]

76.      Of particular importance to Audubon is the irreplaceable role that coastal barriers play in the life cycle of many seabirds and migratory birds.

---

[14] Andrew S. Coburn and John C. Whitehead, *An Analysis of Federal Expenditures Related to the Coastal Barrier Resources Act (CBRA) of 1982*, 35 Journal of Coastal Research 1358 (Mar. 15, 2019), https://shoreline.wcu.edu/Andy/Coburn&Whitehead_2019_JCR.pdf.
[15] FWS, *Final Report to Congress* 1.
[16] FWS, *Coastal Barrier Resources System: What are Coastal Barrier Landforms?*
[17] *Id.*
[18] *See*, *e.g.*, Courtney T. Hackney and William J. Cleary, *Saltmarsh Loss in Southeastern North Carolina Lagoons: Importance of Sea Level Rise and Inlet Dredging*, 3 Journal of Coastal Research 93 (Winter 1987) ("[T]he removal of large quantities of sand for beach renourishment on developed barrier islands may significantly hasten the drowning and disappearance of large areas of salt marsh in the lagoons of southeastern North Carolina.").

77.    As part of its coastal program, Audubon has identified 16 "flagship" bird species on which to focus its conservation efforts. These 16 species represent the various habitat and resource needs of over 350 other bird species.

78.    Nearly all of the flagship birds that ground Audubon's coastal strategy rely on the resources provided by the barrier island and inlet ecosystems now protected by the CBRA, and the natural coastal processes that sustain and perpetuate the habitats found thereon. For example, in the Carolinas, Audubon estimates that a majority of the populations of several flagship species can be found within the System, including 97% of breeding Piping Plovers (*Charadrius melodus*), 90% of breeding American Oystercatchers (*Haematopus palliatus),* and 93% of breeding Least Terns (*Sternula antillarum*). And for many species, there is no alternative to the CBRA: development and engineering on land outside of the System has left the System itself as the last best habitat.

79.    Of particular importance to this case is the unique threat posed to the flagship species by sand mining, inlet modifications, and/or beach renourishment projects in coastal habitats, which are listed as threats in nearly all major conservation and recovery plans for shorebirds and seabirds issued by the federal government or outside entities, including the Atlantic Flyway Shorebird Initiative Business Plan,[19] the U.S. Shorebird Conservation Plan[20] and

---

[19] Atlantic Flyway Shorebird Initiative ("AFSI*"*), *AFSI: A Business Plan* 13 (Feb. 2015), https://atlanticflywayshorebirds.org/documents/AFSI_Business_Plan_2015.pdf ("Coastal engineering activities currently permitted under existing regulatory processes, such as adding beach sand during a 'renourishment project,' frequently destroy habitats used by shorebirds.").

[20] Stephen Brown et al., *United States Shorebird Conservation Plan*, Manomet Center for Conservation Sciences 42 (2001),  https://www.shorebirdplan.org/wp-content/uploads/2013/01/USShorebirdPlan2Ed.pdf ("Shorebirds in the planning region face potential impacts primarily from . . . barrier beach stabilization.").

associated regional plans, the North American Waterbird Conservation Plan[21]  and associated

regional plans, the Recovery Plan for the Great Lakes Piping Plover (*Charadrius melodus*),[22]

Piping Plover (*Charadrius melodus*) Atlantic Coast Population Revised Recovery Plan,[23] Piping

Plover 5-Year Review: Summary and Evaluation,[24] Comprehensive Conservation Strategy for

the Piping Plover (*Charadrius melodus)* in its Coastal Migration and Wintering Range in the

Continental United States,[25] and the Recovery Outline for the Rufa Red Knot (*Calidris canutus*

*rufa*).[26]

---

[21] James A. Kushlan et al., *Waterbird Conservation for the Americas: The North American Waterbird Conservation Plan* 29 (2002), https://www.fws.gov/migratorybirds/pdf/management/northamericawaterbirdconservationplan.pdf ("Beach restoration projects can . . . benefit nesting birds, or can adversely impact their habitat, including from contaminated sediment.").

[22] FWS, *Recovery Plan for the Great Lakes Popping Plover (Charadrius melodus)* 64 (Sept. 2003), https://ecos.fws.gov/docs/recovery_plans/2003/030916a.pdf ("Beach stabilization and 'nourishment' projects also degrade the equality of beach habitat for piping plovers and other coastal species.").

[23] FWS, *Piping Plover (Charadrius melodus) Atlantic Coast Population Revised Recovery Plan* 34 (May 2, 1996), https://www.fws.gov/northeast/pipingplover/pdf/entire_plan.pdf ("The wide, flat, sparsely vegetated barrier beaches preferred by the piping plover are an unstable habitat, dependent on natural forces for renewal and susceptible to degradation by development and shoreline stabilization efforts").

[24] FWS, *Piping Plover (Charadrius melodus). 5-Year Review: Summary and Evaluation* 21, 34 (2020),  https://ecos.fws.gov/docs/five_year_review/doc6378.pdf ("[S]torm-induced adverse effects include post-storm acceleration of human activities such as beach nourishment"; "[W]intering grounds degradation concerns include . . . dredging, sand mining, inlet stabilization and relocation.").

[25] FWS, *Comprehensive Conservation Strategy for the Piping Plover (Charadrius melodus) in its Coastal Migration and Wintering Range in the Continental United States* 16 (Dec. 2012), https://www.fws.gov/midwest/endangered/pipingplover/pdf/CCSpiplNoApp2012.pdf ("The dredging and mining of sediment from inlet complexes threatens the piping plover on its wintering grounds through habitat loss and degradation.").

[26] FWS, *Recovery Outline for the Rufa Red Knot (Calidrus canutus rufa)* 4 (Mar. 2019), https://ecos.fws.gov/docs/recovery_plan/20190409%20Red%20Knot%20Recovery%20Outline%20final%20signed.pdf (Identifying "coastal engineering" as a high-severity, high-urgency threat to the red knot, defined as "all activities described under Shoreline Stabilization . . . such as hard structures, beach nourishment, and dredging.").

80.     Sand mining projects directly impact birds by displacing them from nesting, resting/roosting, and foraging in areas with ongoing mining projects, as well as impacting the water quality and prey base in those areas. The sand mining projects may also permanently degrade these areas and render them less usable (or entirely unusable) as habitats for shorebirds, which further contributes to habitat loss.

81.     The degradation of System units is also likely to exacerbate other threats faced by these species, such as recreational pressure in surviving habitats. As suitable habitats within the System become fewer in number, beachgoers will congregate in larger numbers in a smaller number of surviving coastal habitats.

82.     Sand mining projects of the type blessed by the Excavation Rule also disrupt the natural sediment transport processes that help stabilize and reduce erosion in coastal areas, reducing the resiliency of these areas as wildlife habitats and reducing the storm protections they provide to adjacent communities.[27]

83.     Nesting seabirds like several species of terns require sandy habitat with bare to sparse vegetation to lay their eggs in nests, which are on the ground. This essential habitat is found primarily on barrier islands. Similarly, several migratory shorebirds breed on barrier islands in the U.S. in the spring and summer. An additional group of shorebirds nest in the Arctic and sub-arctic regions of Canada and require habitat and food resources found on U.S. coastal barriers for survival during migration and overwintering along the Atlantic coast and across the Gulf of Mexico into the Caribbean or Central and South America. The life cycles of many

---

[27] *See* Orrin H. Pilkey et al., *Mining of Coastal Sand: A Critical Environmental and Economic Problem for Morocco* (2009), https://pdfs.semanticscholar.org/cd83/6c372eaf7b4fc9e1cf1573ba01027273ddfb.pdf.

seabird and shorebird species is inextricably tied to coastal barriers during their migrations, nesting periods, and/or overwintering as essential habitats for survival.

## II.  Interpretation of CBRA's § 3505(a)(6)(G) exception

84.  In order to effectuate the CBRA's protections, any agency seeking to approve federal financial assistance for projects within the System must engage in an interagency consultation with FWS, in which the agency sends the project proposal to FWS. FWS then provides an opinion as to whether the project would in fact impact a System unit, and, if so, whether the project is allowable under one of the CBRA's exceptions.

85.  In 1994, FWS's Assistant Solicitor was asked to opine on whether a proposal by the U.S. Army Corps of Engineers ("COE") to conduct a beach renourishment project using System sand to replenish a beach outside the System was permissible under 16 U.S.C. § 3505(a)(6)(G).[28] Consistent with the plain text of § 3505(a)(6)(G)—which allows only federal funding for work "within" the System—the Assistant Solicitor explained that "the language of section 6(a)(6) of the CBRA . . . refer[s] to nonstructural projects devoted to stabilizing the shoreline *of a Unit of the CBRS* by mimicking, enhancing, or restoring the natural stabilization systems *of a Unit*" (emphasis in original).[29] Thus, FWS concluded, "beach renourishment projects must be aimed at renourishing the beach of the CBRA Unit in order to qualify for Federal funding under section 6(a)(6)."[30]

86.  The 1994 Memorandum's straightforward reading of § 3505(a)(6)(G) was undisturbed for a quarter century. Indeed, in late 2018, FWS's Principal Deputy Director

---

[28] Memorandum from Charles P. Raynor, Assistant Solicitor, Fish and Wildlife, to Ralph Morgenweck, Assistant Dir., Fish and Wildlife Enhancement, FWS (1994) ("1994 Memorandum").
[29] *Id.*
[30] *Id.*

explained that the 1994 Memorandum's conclusion "has been the basis for [FWS's] interpretation and advice to other federal agencies for over 20 years," noting that Congress had subsequently reauthorized the CBRA twice since the Memorandum without contradicting the Memorandum's interpretation of § 3505(a)(6)(G), and affirming that FWS as of December 2018 had "no plan to revisit" the Memorandum's conclusion."[31] In the intervening years, FWS has cited the 1994 Memorandum to reject proposals to move System resources to areas outside the system.[32]

87.     The 1994 Memorandum was compelled by the CBRA's requirement that the exceptions only apply to projects "within" the System, as well as the CBRA's explicit prohibition on federal financial assistance for inshore stabilization projects.

88.     The 1994 Memorandum was also compelled by Congress's conservationist and anti-development intent in passing the CBRA. The limited exceptions to the CBRA that Congress created were not intended to facilitate the conversion of the delicate System into a reservoir of sand to be mined for the benefit of developed or developing beachfront communities around the country.

89.     Indeed, it is difficult, if not impossible, to conceive of a project that "is consistent with the purposes" of the CBRA—a required determination for any project exempted by the Section 6 of the CBRA—yet permanently removes resources from the System it purports to protect.  16 U.S.C. § 3505(a)(6).

---

[31] Letter from Margaret Everson, Principal Deputy Dir., FWS, to the Honorable Garret Graves, House of Reps. (Dec. 21, 2018).
[32] *See e.g.,* Letter from Eric Schrading, Field Supervisor, FWS,  to Peter R. Blum, Chief, Planning Div., Philadelphia Dist., COE (Aug. 9, 2016).

### III.    The Excavation Rule

90.    Notwithstanding the plain text of the CBRA, longstanding FWS practice, and specific guidance based on the CBRA's text, some beachfront communities have sought to evade the CBRA's protections and mine the nearby (and therefore cheaper) sand from System units. While the CBRA in no way prevents these communities from renourishing their beaches, the CBRA does force the communities to choose between mining sand from System units at their own cost,[33] or accepting federal subsidies for projects that source sand from areas that are less crucial for coastline protection and ecological diversity.

91.    The most recent entreaty to lift CBRA protections came on October 25, 2019, when three Members of Congress, each representing a coastal district, requested that Secretary Bernhardt "correct" DOI's plain reading of CBRA Section 6.[34] A mere six business days later, Secretary Bernhardt abruptly jettisoned over two decades of agency precedent, announcing the Excavation Rule in a one-and-a-half page letter.[35] Secretary Bernhardt explained that he had asked DOI's Office of the Solicitor to review the 1994 Memorandum, and that the Solicitor had concluded that the § 3505(a)(6)(G) exception is *not* limited to projects within the System; Bernhardt also explained that he had personally reviewed the question and agreed with the Solicitor's Opinion.

---

[33] Indeed, in 2007 GAO found that 16 percent of System units had experienced some level of development despite the protections of the CBRA, largely as a result of sufficient commercial and public interest and local government support for development despite the non-availability of federal funds. *See* U.S. Gov't Accountability Off., GAO-07-356, *Coastal Barrier Resources System* 13.

[34] Letter from Reps. Jeff Van Drew, David Rouzer & Garret Graves to the Honorable David Bernhardt (Oct. 25, 2019), https://assets.adobe.com/public/ed89ce35-1aee-4965-70e4-fbf3af715d6b.

[35] Letter from Sec'y David Bernhardt to the Honorable David Rouzer (Nov. 4, 2019) ("Bernhardt Letter"), https://assets.adobe.com/public/2530913d-8b45-4178-4fc2-4c7d4d280a87 (attached as Exhibit A).

92.     The Bernhardt Letter is bereft of reasoning or supporting evidence. Its chief rationale for deviating from Congress's express requirements is the single, conclusory sentence that "[t]he language [of 16 U.S.C. § 3505(a)(6)(G)] is not ambiguous."

93.     The Bernhardt Letter goes on to argue that, assuming that CBRA Section 6 is ambiguous, the Rule is nonetheless appropriate. His explanation on this score, set forth below in its entirety, is conclusory:

> Congress did not intend to constrain the flexibility of agencies to accomplish the CBRA's broader purposes of protecting coastal barrier resources by requiring beach renourishment to occur "solely" within the System. Thus, even to the extent the statutory language could be considered ambiguous, it should be interpreted in a way that furthers Congress' stated purpose of protecting coastal barrier resources.

94.     The Bernhardt Letter creates the Excavation Rule, concluding that "sand from units within the System may be used to renourish beaches located outside of the System, provided the project is consistent with the purposes of the Act," and explaining that Bernhardt had "directed the U.S. Fish and Wildlife Service to bring its communications into compliance with the statute."

95.     Defendants did not merely fail to justify the Excavation Rule. They also wholly failed to consider a battery of fundamental concerns implicated by the Rule. They do not explain how the CBRA's purposes would be furthered by mining sand from the System to replenish non-System beaches or how such an activity would (or even could) preclude adverse effects to the System.

96.     Defendants wholly neglect to explain how the Rule furthers the CBRA's purposes of minimizing the loss of human life and wasteful expenditures of Federal revenues while protecting sensitive coastal resources.

97.     In announcing the Rule, Defendants imply without any explanation that renourishing "beaches located outside of the System" furthers "Congress' stated purpose of protecting coastal barrier resources," a conclusion unaccompanied by any reasoned analysis.

98.     Nor has DOI explained how the Rule will prevent *cumulative* impacts to the System from the Rule's repeated application to projects that purport to be consistent with the CBRA by themselves, but that together could result in large-scale transfers of CBRA-protected sand to non-CBRA beaches.

99.     Likewise, DOI has not undertaken any analysis of where its burdens will fall, including which communities, ecosystems, avian species, and other wildlife will be most affected by federally subsidized transfer of CBRA resources outside of the System. Defendants have not prepared an EIS or an EA evaluating the Excavation Rule.

100.    The Bernhardt Letter references the Secretary's consultation with DOI's Office of the Solicitor, but did not attach any written analysis or opinion from the Office of the Solicitor supporting the Excavation Rule.

101.    Since the Excavation Rule was announced in the Bernhardt Letter, Plaintiff has obtained the underlying legal opinion, signed by DOI Division of Parks and Wildlife Associate Solicitor Peg Romanik, and dated October 30, 2019 (three business days after the letter from Members of Congress).[36]

102.    The core legal assertion of the Romanik Memorandum is that the exceptions outlined in 16 U.S.C. § 3505(a) for "Federal expenditures and . . . financial assistance . . . within the System" are not actually limited to expenditures and financial assistance within the System.

---

[36] Memorandum from Peg Romanik, Associate Solicitor, DOI Div. of Parks and Wildlife, to Margaret Everson, Principal Deputy Dir., FWS (Oct. 30, 2019) ("Romanik Memorandum") (attached as Exhibit B).

103.     According to the Romanik Memorandum, the "within the System" language in the introductory paragraph to § 3505(a) is not operative in the exceptions detailed in § 3505(a)(6), only because that subsection does not explicitly reiterate the introductory paragraph's limitation that excepted expenditures occur "within the System" (a limitation not reiterated in any of § 3505(a)'s other subsections either).

104.     Additionally, the Romanik Memorandum ignores the CBRA's explicit prohibition on federal expenditures to carry out "any project to prevent the erosion of, or to otherwise stabilize, any inlet, shoreline, or inshore area." 16 U.S.C. § 3504(a)(3). Nor does the Memorandum attempt to explain why Congress would draft that prohibition only to render it a nullity in the following section under DOI's proposed expansion of the § 3505(a)(6)(G) exception.

105.     The Romanik Memorandum also fails to grapple with Congress's intent in drafting the CBRA. Nowhere does the Memorandum acknowledge the concerns, apparent on the face of the CBRA and in its legislative history, that federal expenditures to battle erosion of coastal areas were "hopeless" and "costly,"[37] nor does the Memorandum attempt to reconcile those concerns with an Excavation Rule that allows System units to be dredged in order to replenish beaches outside the System facing the same inescapable effects of erosion that prompted the CBRA.

106.     The Romanik Memorandum acknowledges that Congress had "enacted the CBRA to restrict Federal expenditures that encourage development of coastal barriers," yet later concludes that Congress intended the System's resources to be dredged for the renourishment of any coastal area, "even if [they] are located outside the System." The Memorandum makes no

---

[37] 127 Cong. Rec. 7,571, *supra* n.7.

attempt to explain how the renourishment of developed beaches (likely to encourage even further development)[38] could possibly further Congress's explicit intent to discourage unwise development in vulnerable coastal areas through the CBRA, nor does it cite anything in the statute or legislative history supporting that conclusion.

107.    The November 4 letter from Secretary Bernhardt was DOI's first announcement of the Excavation Rule, which for the first time since the passage of the CBRA provides the federal government with a basis to fund projects seeking to mine sand from within the System to replenish developed beaches outside it.

108.    The Excavation Rule was not announced in the Federal Register, nor did the Department solicit comment or feedback from the public prior to purporting to finalize the new rule.

109.    Nonetheless, Secretary Bernhardt has directed FWS to implement the Excavation Rule.

110.    FWS has since conformed its public-facing materials to implement the Excavation Rule, updating its website to explain that the CBRA now allows for System units to be dredged to replenish beaches outside the System and that FWS will assist federal agencies in evaluating such projects through the interagency consultation process.

111.    FWS has begun issuing consultation opinions in accordance with the Excavation Rule.  Plaintiff is aware of at least two projects for which FWS has recently advised COE that proposals to remove sand from System units to replenish nearby beaches may proceed under the § 3505(a)(6)(G) exception, in light of the Excavation Rule.[39]  Since the Excavation Rule, COE

---

[38] *See* Armstrong et al., *supra* n.9.
[39] *See* Letter from Pete Benjamin, Field Supervisor, FWS Raleigh ES Field Off., to Christine M. Brayman, COE Deputy Dist. Eng'r for Programs and Project Mgmt. (Mar. 10, 2020).

has also proposed and is seeking public comment on two 50-year beach renourishment projects that would use System Units as sources for sand through the year 2086.[40] The Rule has thus had direct and concrete effects on the public and the administration of the CBRA.

## CLAIMS FOR RELIEF

### Count One
### (Agency Action Contrary to Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2))

112.    Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

113.    The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

114.    The Excavation Rule is a final agency action that is contrary to the plain text of the CBRA, and, at a minimum, is an unreasonable interpretation of the Act.

115.    The Excavation Rule is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of Defendants' statutory authority, *id.* § 706(2)(A), (C).

### Count Two
### (Arbitrary and Capricious Rulemaking in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2))

116.    Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

117.    The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious," *id.* § 706(2)(A).

---

[40] *See* Letter from Jennifer L. Owens, Chief, Envtl. Res. Section, COE Wilmington Dist. (June 4, 2020), https://www.carolinabeach.org/home/showdocument?id=1410 (Carolina Beach proposal); Letter from Jennifer L. Owens, Chief, Envtl. Res. Section, COE Wilmington Dist. (June 4, 2020) (Wrightsville Beach proposal).

118.     The Excavation Rule is a final agency action that does not explain, justify, or support its conclusions. The Rule also fails to consider important aspects of the problem by ignoring the Rule's effect on the resources and communities protected by the CBRA.

119.     The Excavation Rule does not adequately explain the basis for the Department's change in policy in allowing federal funds to subsidize sand mining within the System to replenish beaches outside it.

120.     The Excavation Rule is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of Defendants' statutory authority, *id.* § 706(2)(A), (C).

**Count Three**
**(Violation of the Procedural Requirements of the Administrative Procedure Act,**
**5 U.S.C. § 553, 706(2)(C))**

121.     Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

122.     The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "without observance of procedure required by law." *Id.* § 706(2)(D).

123.     The APA requires that agency "rules" comport with specific requirements for their adoption, including public notice-and-comment. *Id.* § 553.

124.     The Excavation Rule is a "rule" within the meaning of the APA, but was promulgated without notice-and-comment or other procedures required by the APA.

125.     The Excavation Rule was promulgated without the procedures required by law, including notice and comment. *Id.* § 706(2)(D).

**Count Four**
**(Violation of the National Environmental Policy Act, 42 U.S.C. § 4332(C),**
**5 U.S.C. § 706(2)(C))**

126.    Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

127.    Under NEPA, federal agencies must prepare an Environmental Impact Statement or an Environmental Assessment to consider the environmental effects of major federal actions. This analysis must precede the agency action, so that agencies can make informed choices among different alternatives.

128.    The Excavation Rule is a major federal action, *see* 40 C.F.R. § 1508.18, and significantly affects the quality of the human environment through its changes to the protections afforded by the CBRA. Defendants promulgated the Excavation Rule without observance of the procedures required by NEPA.

129.    The Excavation Rule was promulgated without procedure required by law. 5 U.S.C. § 706(2)(D).

**Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court:

1.    declare that the Excavation Rule violates the APA and NEPA and is therefore unlawful;

2.    vacate the Excavation Rule and enjoin Defendants from issuing consultation opinions implementing the Excavation Rule;

3.    award Plaintiff its costs, attorneys' fees, and other disbursements for this action; and

4.    grant any other relief this Court deems appropriate.

31

Dated: July 2, 2020                    Respectfully submitted,

                                       */s/ Jeffrey Dubner*
                                       Aman George (*pro hac* to be filed)
                                       Travis Annatoyn (*pro hac* to be filed)
                                       Jeffrey Dubner (N.Y. Bar No. 4974341)
                                       Sean Lev (*pro hac* to be filed)
                                       Democracy Forward Foundation
                                       P.O. Box 34553
                                       Washington, D.C. 20043
                                       (202) 448-9090
                                       ageorge@democracyforward.org
                                       tannatoyn@democracyforward.org
                                       jdubner@democracyforward.org
                                       slev@democracyforward.org

                                       *Counsel for Plaintiff*